GEORGE F. WILLETT & another *vs.* ROBERT F. HERRICK & others.

Norfolk. November 8–12, December 18, 1926. — March 9, 1927.

Present: RUGG, C.J., BRALEY, CROSBY, CARROLL, & WAIT, JJ.

*Conspiracy. Actionable Tort. Release,* Consideration, Validity. *Contract,* Consideration, Validity, Construction. *Fraud. Agency,* Existence of relation. *Trust,* What constitutes fiduciary relation. *Pledge. Duress. Undue Influence. Evidence,* Presumptions and burden of proof.

To enable a party to rescind a contract because of fraud or misrepresentations, the fraud or misrepresentations relied on must have operated to cause him to make the contract, or have been intended to influence his action in the particular complained of.

To set aside an agreement because of duress, the will of the party subjected to duress must have been overcome, the means made use of must be such as to overcome the mind of an ordinary person, and the duress must have been connected with and underlie the contract.

The declaration in an action at law set forth that the defendants, F, a banker and note broker, W, a banker, and H, conspired together, and, by the use of their combined power and influence, through deception and fraud and duress induced the plaintiff to give into their control the majority stock interests in certain corporations, and, finally, to execute and deliver to the defendants a general release of all demands for a consideration totally inadequate. The release was under seal,

and the consideration recited therein was "One Dollar ($1.00) and other valuable considerations." The validity and effect of the release were issues in dispute at the trial, the plaintiff contending that the release was obtained by fraud and duress, and the defendants asserting that it was a bar to the plaintiff's action. At the trial it appeared that at the time of the giving of the release $125,000 was paid to assignees of the plaintiff, and that several other documents passed between the parties. Upon an examination of a voluminous record of the evidence introduced at a trial consuming one hundred eighty-five court days, it was *held*, that

(1) The delivery of the money and several documents at and near the time of the delivery of the general release were parts of the same transaction, and the release was founded on a consideration;

(2) The terms of the release were general and purported to dispose of all causes of action and of all claims and demands arising out of any transactions between the plaintiff and the defendants;

(3) Even if the plaintiff did not have in mind wrongs committed against him by the defendants before the execution and delivery of the release, it was a bar to the action if voluntarily given and free from fraud;

(4) The record disclosed no evidence of fraud entering into the subject matter of the release: it appeared that the settlement was intelligently and freely made and that no misrepresentations of the defendants entered into its execution;

(5) There was no causal connection between misrepresentations made by the defendants F and W to lead the plaintiff into the earlier transactions as to his corporate interests and the transaction relating to the giving of the release: the alleged misrepresentations were not inherent in the execution of the release; such evidence as there was on the subject was to the effect that the time when the release first was thought of was months after the alleged fraudulent representations by the defendants;

(6) A contention by the plaintiff, that the release was voidable because the defendants after the plaintiff's transfer to them of his controlling stock interests stood in a fiduciary relation to him and were bound to disclose to him facts in their knowledge, which, if known to him, would have caused him not to execute and deliver the release, was untenable because the transfer was by a sale for a stated consideration with an option to the plaintiff to repurchase at a certain price, and the defendants were not thereby placed in the position of fiduciaries with such a duty to disclose;

(7) A contention by the plaintiff, that the transaction, although in form a sale, really was a pledge, fixing upon the defendants such a duty to disclose, was untenable because the evidence failed to show it to be a pledge, and, even if it were, it did not fix upon the defendants such a duty to disclose;

(8) A contention by the plaintiff, that, by reason of a conversation between him and the defendant F relating to the placing of a loan by a corporation of which the plaintiff had control, which conversation finally resulted in the transaction by which he transferred his con-

trolling stock interest to the control of the defendants, the defendant F became the plaintiff's agent with the duty later to make the disclosures above described, was untenable because under that contention the burden of proof was on the plaintiff to show such agency, and the conversation in question, which also was consistent with a desire on the part of F to protect customers of his who had invested in the plaintiff's paper and to save them from loss, did not sustain the burden of proving the plaintiff's contention; *Reed* v. *A. E. Little Co.* 256 Mass. 442 distinguished;

(9) The evidence showed that about four months before the execution and delivery of the release an attachment was made in a suit against the plaintiff of his interest in the stock which had been transferred to the control of the defendants, following which the plaintiff sought advice from and made an assignment to three persons who acted for him in initiating and carrying out the transaction which closed with the delivery of the general release; but there was no evidence to prove allegations in the declaration to the effect that the defendants, in order "to strongly exert an influence over and pressure upon the plaintiffs to transfer" the title to the shares, "concealed from . . . [the plaintiff's advisers and assignees] the conspiracy that had been entered into, and the . . . means" therein employed;

(10) There was no evidence that the defendants, in exercising their rights under the agreement with the plaintiff by which control of the plaintiff's corporations was transferred to them, by concealment or otherwise induced the execution of the release, or violated the conditions of the contract;

(11) There was no evidence that the defendant H bore any fiduciary relation to the plaintiff; the plaintiff's evidence was to the contrary;

(12) Acts by the defendant H in purchasing claims against the plaintiff and commencing enforcement of them by suits were within his legal rights, and his conduct in the circumstances was not open to question in this action;

(13) There was no evidence of intentional mismanagement on the part of the defendants of the properties formerly controlled by the plaintiff; negligent mismanagement, even if it existed, would not support the cause of action relied on by the plaintiff;

(14) There was no evidence warranting a finding that the signing and delivery of the release were procured through illegal operation of the alleged combined power and influence or through duress;

(15) There being no evidence for the jury that any illegal methods induced the signing of the release, it was a complete bar to the action;

(16) Judgment was ordered for the defendants.

TORT, with a declaration as amended, so far as material, described in the opinion.*    Writ dated February 14, 1921.

---

*The declaration as amended, upon which the action was tried, was in two counts and occupied ninety-five pages of the printed record. The record of the trial contained in the bill of exceptions comprised 5,781 printed pages. REPORTER.

The action previously was before this court when, by a decision reported in 242 Mass. 471, demurrers by the defendants were sustained in certain particulars, and the plaintiffs were given leave to amend. After several amendments, the action was tried in the Superior Court before *Callahan,* J., during one hundred eighty-five court days. Material evidence is described in the opinion. Among numerous exceptions saved by the defendants were exceptions to a refusal by the trial judge, at the close of the evidence, to order verdicts for the defendants. The jury found for the plaintiffs in the sum of $10,534,109.07. The defendants alleged exceptions.

*G. L. Mayberry,* (*D. E. Mayberry* with him,) for the defendants F. S. Moseley and Company.

*F. E. Snow & T. Hunt,* (*W. A. Gaston & A. B. Nelson* with them,) for Kidder, Peabody and Company.

*H. D. McLellan,* (*R. Cutler & J. T. Noonan* with him,) for the defendant Robert F. Herrick.

*S. L. Whipple, B. B. Jones, J. Wiggin, & D. E. Hall,* (*E. O. Proctor & P. N. Jones* with them,) for the plaintiffs.

CARROLL, J. In this action of tort the defendants are charged with having deprived the plaintiffs of their property and business by means of an unlawful combination or conspiracy. The plaintiffs are George F. Willett and Edmund H. Sears, late copartners under the firm name of Willett, Sears and Company. The defendants are the persons alleged to be copartners in the firm of Kidder, Peabody and Company, the persons alleged to be copartners in the firm of F. S. Moseley and Company, and Robert F. Herrick. The Chase National Bank of New York City was named in the writ as one of the defendants but it was not served with process and was not a party to the trial. Daniel G. Wing was also named as one of the defendants. At the close of the plaintiff's evidence a verdict in Wing's favor was directed by the

After the original declaration was passed on by this court (*Willett* v. *Herrick,* 242 Mass. 471), several amendments were allowed. The case was tried in the Superior Court. The trial occupied one hundred and eighty-five court days, beginning November 8, 1923. On December 18, 1924, the

jury returned a verdict for the plaintiffs in the sum of $10,534,109.07. The case is before us on the defendants' exceptions.

One of the amendments allowed in the Superior Court, after the decision in the Supreme Judicial Court on the defendants' demurrer to the declaration, so far as material to this discussion sets out that the defendants, having obtained control of the shares of the American Felt Company (hereinafter called the Felt Company) and the shares of the Daniel Green Felt Shoe Company (hereinafter referred to as the Green Company) by the fraudulent means alleged, in order to coerce the plaintiffs to surrender their right to redeem the same and to surrender additional shares of the Green Company, concealed the existence of the conspiracy from the plaintiffs, and by concealment and false representations procured a release of all claims and demands, and by the wrongful means alleged advised the plaintiffs and their assignees that a compromise settlement should be made with the plaintiffs' creditors; that the plaintiffs, being ignorant of the defendants' selfish motives, and of the conspiracy, were coerced by the defendants to assent to an offer of $125,000 made by the defendants, for the transfer of the shares of the Felt and Green companies, and the shares of the Green Company held by Kidder, Peabody and Company under an agreement; that the plaintiffs, misled by the defendants, conveyed to J. Sidney Stone, Frank G. Allen and Charles J. Prescott as alleged "trustees" the aforesaid shares and the right to redeem the shares of the Green Company and the Felt Company mentioned in an agreement of "July 29, 1918"; that the trustees transferred the shares to the defendants, and the right of redemption, and received the sum of $125,000.

It is further alleged that, on the date of the conveyance of the shares by the trustees, the plaintiffs executed a general release of the defendants, a copy of which is annexed; that the plaintiffs were induced to sign the instrument of release by the defendants' concealment of the existence of the conspiracy and by fraudulent misrepresentations, in violation of fiduciary duties set forth; that "for the purpose of causing

. . . Choate, Allen, Prescott and Stone to strongly exert an influence" on the plaintiffs to transfer the shares and execute the release, the defendants concealed from Choate, Allen, Prescott and Stone the conspiracy and the wrongful acts of the defendants; that the release was without consideration; that the securing of its delivery was one of the objects of the conspiracy, and a step in carrying it into effect.

This general release recited that Willett and Sears individually and as copartners, "in consideration of One Dollar ($1.00) and other valuable considerations, . . . remise, release, and forever discharge KIDDER, PEABODY & Co. and F. S. MOSELEY & Co., and their associates . . . of and from all and all manner of actions or causes of action, suits, debts, dues, accounts, covenants, contracts, agreements, judgments, claims and demands whatsoever, direct or indirect, in law or in equity, which against the said KIDDER, PEABODY & Co. and F. S. MOSELEY & Co., and their associates, we, or either of us, . . . ever had, now have, or . . . can, shall, or may have, arising out of, or which may arise out of, any transactions had between us, or either of us, and the said KIDDER, PEABODY & Co. and F. S. MOSELEY & Co., and their associates, or any of them, or by reason of any cause, or matter, or thing whatsoever from the beginning of the world to the date of these presents." This instrument was under seal and was signed by George F. Willett and Edmund H. Sears. It was dated March 24, 1919.

In June, 1918, the Chase National Bank held two notes of Willett, Sears and Company for $200,000 each, due July 15, 1918, and October 15, 1918, respectively, which were secured by twelve thousand shares of the Felt Company common stock standing in the plaintiffs' names and pledged by them. The Girard National Bank of Philadelphia also held a note of the plaintiffs for $100,000, due in September of that year, and secured by two thousand shares of the Felt Company's common stock pledged by the plaintiffs. The Green and Felt companies required a special loan of $3,000,000. Negotiations were carried on for obtaining this loan, meetings of bank officials were held and the plaintiffs were informed they would have to take care of the notes held by the Chase and

Girard banks. Finally, it was agreed that the plaintiffs should sell certain shares of stock of the Felt and Green companies, and on July 31, 1918, the sale was consummated. Willett knew that Herrick was one of the associates in the proceeding.

The writings confirming the undertaking of July 31 were dated July 29, 1918. The details appear in a written communication to Willett, Sears and Company, signed by Kidder, Peabody and Company, and F. S. Moseley and Company, and in substance are as follows: "We have this day, in behalf of ourselves and associates, bought from you 16,500 . . . shares of the American Felt Company common stock and 500 . . . shares common stock of the Daniel Green Felt Shoe Co. . . . In consideration of the foregoing we agree to sell you or your assigns all of the aforesaid shares for the sum of $1,227,000 . . . to be paid on or before July 25, 1920." On the same date Willett, Sears and Company gave to Kidder, Peabody and Company and F. S. Moseley and Company a written memorandum which declared, "We have this day sold to you sixteen thousand five hundred . . . shares of American Felt Company common stock and five hundred . . . shares of Daniel Green Felt Shoe Company common stock for the sum of $500,000, the receipt of which is hereby acknowledged." The purchase price was paid by checks of Kidder, Peabody and Company.

On July 31, 1918, the agreement for the $3,000,000 loan to the Felt and Green companies was perfected. The loan was to be made by four national banks and one trust company in Boston, the Chase National Bank of New York, Kidder, Peabody and Company and F. S. Moseley and Company, in the proportions set out in "Schedule B" annexed to the bankers' circular. This circular stipulated that if the existing indebtedness of $2,500,000 of the companies due to various banks, and $500,000 due to the United States government, as well as outstanding paper placed by brokers, should not be satisfactorily provided for by February 15, 1919, such proceedings were to be taken as appeared wise to liquidate the two companies. On the same date Kidder, Peabody and Company received three thousand,

seven hundred fifty-one shares of the Green Company's stock to be voted by them until Willett, Sears and Company availed themselves of the option already referred to. This was done in compliance with a condition in the loan agreement.

After these arrangements had been carried out, on November 29, 1918, one Sydeman brought a suit in equity against Willett, Sears and Company on a contract, claiming damages in the amount of $300,000, and seeking to reach and apply the Felt and Green stock in the name of Kidder, Peabody and Company, as well as stocks in other companies. Other actions and suits were brought against Willett, and Willett, Sears and Company. There was evidence that Willett requested Charles F. Choate, Jr., Frank G. Allen and J. Sidney Stone to assist in straightening out his affairs. In December, 1918, Willett and Sears gave Allen a written power of attorney.

In January, 1919, according to the testimony of Fessenden, a member of the firm of F. S. Moseley and Company, at an interview between himself, Allen and Stone, Allen suggested that the defendants purchase the Green stock deposited with Kidder, Peabody and Company and the option to buy the Felt and Green stocks for $125,000, in order that a settlement might be made with the plaintiffs' creditors. On February 1, 1919, Stone wrote Willett, who was then at Pinehurst, North Carolina, informing him of the offer of $125,000 for the Felt and Green stocks, and requesting authority to act, stating, "the only alternative to making this sale is bankruptcy." On March 13, 1919, Willett, Sears and Company assigned to Messrs. Allen, Prescott and Stone, all their interest in the Green Company's stock, including their right to repurchase the stock of the Felt and Green companies. By this instrument, which was signed by both Willett and Sears, the assignees were given "full authority to dispose" of all the "shares of stock and option" for $125,000 in cash, and to dispose of the proceeds among the creditors of Willett, Sears and Company.

On the same day, the assignees wrote to Fessenden, offering to sell to him or to those whom he represented the shares

of stock and the option to repurchase for $125,000, "and a full release by American Felt Company of all claims" against the plaintiffs individually and the firm of Willett, Sears and Company. On March 21, the plaintiffs gave to the assignees a writing granting them the power to dispose of the firm assets and settle with their creditors, ratifying all former acts of the assignees done in the course of such settlement. On this date (March 21), the assignees wrote to Kidder, Peabody and Company, offering to sell to them or to those whom they represented the shares of stock and the option for the sum of $125,000. The defendants agreed to pay $125,000 for the shares and the option, and papers were prepared to close the transaction.

On March 24, 1919, Willett met Allen, Stone, and his counsel, Edward W. Hutchins. At this meeting the question of Willett's signing the general release was discussed. The advice of Hutchins was asked concerning the possibility of any claim Willett might have against the defendants, and Willett was advised that such claim would be discharged if he signed the release. Sears testified that he acted on the advice of Hutchins and signed the papers, believing it the best thing to do, and because he had confidence in Choate, Allen, Stone and Hutchins. The sale was then completed: a check of Kidder, Peabody and Company for $125,000, payable to Allen, Stone and Prescott, the assignees of Willett, Sears and Company, was delivered to them, and the general release, duly signed, was delivered, and also an assignment from the assignees of the Green stock. In addition, Willett, Sears and Company gave a special release to Kidder, Peabody and Company, F. S. Moseley and Company, and their associates, releasing them from all obligations with respect to the shares of the Green stock standing in the name of Kidder, Peabody and Company, and the assignees transferred to Kidder, Peabody and Company, F. S. Moseley and Company, and their associates, all title to the Felt and Green shares. Willett and Sears also discharged the defendants of all obligations as set forth in the "agreement, dated July 29, 1918," concerning the shares of stock of the Felt and Green companies, and also discharged them of all

obligations with respect to the Green stock which stood in the name of Kidder, Peabody and Company. A document under seal, releasing Kidder, Peabody and Company and F. S. Moseley and Company, and their associates, from all obligations and agreements included in the contract of sale, dated July 29, 1918, was signed by the assignees; and the plaintiffs assigned in writing, under seal, all their right in the option to repurchase the stock of the Felt and Green companies. In this instrument they released the defendants from all obligations and agreements under the agreement of sale dated July 29, 1918.

No return of the consideration for the general release has been made, and no notice of rescission has been given.

The original declaration made no mention of the general release; by a subsequent amendment it became a part of the declaration. Its validity and effect were issues in dispute at the trial, the plaintiffs contending that the release was obtained by fraud and duress, the defendants asserting that it was a bar to the plaintiffs' action.

On March 24, 1919, when the general release was executed, and the documents already referred to were delivered, the sale of the shares in the Felt and Green companies and the assignment of the right to repurchase were completed. At this time $125,000 was paid by the defendants. These matters were all a part of the same transaction. The settlement, therefore, was founded on a consideration. Furthermore, the release was under seal. *Kaplan* v. *Suher,* 254 Mass. 180. *Chertok* v. *Morang,* 228 Mass. 598. The plaintiffs' debt of $500,000 to the Chase and Girard banks had been paid by the defendants and the plaintiffs were discharged of all liability to the Felt Company.

Although the defendants were discharged of liability under the agreement of July 31, 1918, by the special release, the general release was not limited to a particular demand; it was comprehensive in its language. Its terms were plain and distinct. It disposed of all causes of action, and of all claims and demands arising out of any transactions between the plaintiffs and defendants. *Deland* v. *Amesbury Woollen & Cotton Manuf. Co.* 7 Pick. 244. *Rich* v. *Lord,* 18 Pick. 322.

*Averill* v. *Lyman,* 18 Pick. 346.    *Klopot* v. *Metropolitan Stock Exchange,* 188 Mass. 335.    This paper included all demands which the plaintiffs might hereafter have "arising out of, or which may arise out of, any transactions had between us." See *Pierce* v. *Parker,* 4 Met. 80; *Merrifield* v. *Baker,* 11 Allen, 43.    If the plaintiffs were in fact ignorant of the contents of the instrument of settlement, this would not in the absence of fraud or duress be a ground for setting it aside.    *Atlas Shoe Co.* v. *Bloom,* 209 Mass. 563.    *Costello* v. *Hayes,* 249 Mass. 349.    The plaintiffs were men of business training. Willett had had considerable banking experience; Sears had been a director in a national bank.    The chief business of the firm of Willett, Sears and Company was the reorganization, management and operation of industrial corporations.    The terms of the settlement with the defendants were understood by the plaintiffs and they had the advice of counsel. Even if the plaintiffs did not have in mind when the document was signed the wrongs of which they now complain, as the release was a general one the present action was included in it.    *Hyde* v. *Baldwin,* 17 Pick. 303, 307.    *Pierce* v. *Parker, supra.    Merrifield* v. *Baker, supra.    Klopot* v. *Metropolitan Stock Exchange, supra.    Atlas Shoe Co.* v. *Bloom, supra. Costello* v. *Hayes, supra.*    In addition to this, they were advised that if the release were executed they would have no further claim against the defendants.    The settlement, therefore, was a final arrangement between the parties, and, if free from fraud, it was a bar to the plaintiffs' action. *Barry* v. *Bay State Street Railway,* 222 Mass. 366.    *O'Meara* v. *Smyth,* 243 Mass. 188.    *Boss* v. *Greater Boston Mortgage Corp.* 251 Mass. 455.    *Butler* v. *Prussian,* 252 Mass. 265. *Reinherz* v. *American Piano Co.* 254 Mass. 411.

The plaintiffs contend that they were induced to sign the release because of the defendants' misrepresentations, and that for this reason it can be avoided.    We have been unable to find in the voluminous record any misrepresentations made by the defendants concerning the contents or meaning of the document executed on March 24, 1919.    There was no evidence of fraud entering into the making of this agreement.    None of the defendants were then present.    Sears

testified that, at the time he signed the release on March 24, he was informed by his counsel that it was "proper for me to sign"; that he believed it the best thing to do. He was asked: "You had confidence in Mr. Choate and Mr. Stone and Mr. Allen and Mr. Prescott?" He answered, "Yes." "And in Mr. Hutchins?" "Yes." Willett testified that Allen, Stone and Hutchins were present. To the question: "Will you state what was said?" He replied: "I asked Mr. Hutchins — or Mr. Hutchins said to me that they had been discussing the matter." He was asked: "What matter?" and answered: "The matter of our signing this release, and that they were strongly of the opinion that I should sign it. I asked him the significance of it, and he said that it took away from us the right to ever bring action against these parties mentioned in it because of the transactions which had taken place between us." From this evidence it appears that the settlement was intelligently and freely made and no misrepresentations of the defendants entered into the execution of the release.

Important misrepresentations relied on by the plaintiff were alleged to have been made by Fessenden in the summer and fall of 1918, and in January, 1919, and were in effect that the Felt and Green companies were hopelessly involved; that he (Fessenden) was much disturbed and troubled about them. The alleged misrepresentations of Winsor, a member of the firm of Kidder, Peabody and Company, were made in November, 1918, during a conversation with Willett in which reference was made to Willett's lack of business ability, and that the properties had no value. Assuming that a jury could find that the misrepresentations as testified to by Willett were made by Fessenden and Winsor, there was nothing to show that they were made for the purpose of inducing the plaintiffs to execute a general release, or to influence their action in connection therewith. The subject matter of a release was not discussed; it was not referred to or suggested. To enable a party to rescind a contract because of fraud or misrepresentations, the fraud or misrepresentations relied on must have operated to cause him to make the contract, or have been intended to influence his action in

the particular complained of.  *Harvey* v. *Squire*, 217 Mass.
411.  *Hindman* v. *First National Bank of Louisville*, 112 Fed.
Rep. 931, 942.  No mention of the release was made until
after the plaintiffs had agreed to sell the shares.  The delivery
of the release originated in the transaction of sale.  The prop-
osition to sell the plaintiffs' rights in the shares of stock
in the Felt and Green companies came from the plaintiffs'
assignees; it was their suggestion.  They anticipated the
bankruptcy of the plaintiffs.  There was no causal relation
between the making of the misrepresentations and the giv-
ing of the release.  The alleged misrepresentations were not
inherent in its execution.

On March 13 the plaintiffs assigned to Allen, Prescott and
Stone, all right, title and interest in the Felt and Green
properties, giving to their assignees full authority to sell
"to whomsoever they see fit for . . . $125,000."  Nothing
up to this time had been said with reference to the release
by the plaintiffs.  The written offer of the assignees, of the
same date, to sell the Felt and Green option and the Green
stock for $125,000 contains these words: ". . . a full release
by American Felt Company of all claims and demands
against Willett, Sears & Co. and George F. Willett or
Edmund H. Sears, individually."  This apparently was the
first time the question of a release was considered.  Herrick
testified that he had not thought of a release by Willett,
Sears and Company to the defendants, until he saw the letter
of the assignees of March 13, calling for a release from the
Felt Company.  The jury, of course, could believe or dis-
believe this testimony.  If they believed it, it showed that
the release was not procured by any misrepresentations or
fraud or by the wrongful use of power in combination.  If they
disbelieved it, there was no evidence to show that the alleged
misrepresentations were made to induce the plaintiffs to sign
the release.  Nor was there any evidence from which it
could be reasonably inferred that such a purpose was in the
mind of Fessenden or of Winsor.  *Hunnewell* v. *Duxbury*,
154 Mass. 286.

On February 8, Choate, Stone, Allen and Prescott joined
in a letter to Willett, telling him that unless the suggestion

of Stone to sell for $125,000 was accepted, bankruptcy was inevitable. No misrepresentations by the defendants were made to these gentlemen; the assignment and the sale to the defendants were in no way brought about by misrepresentations. The general release followed as a part of the transaction. There was no evidence that the execution of the assignment, the sale to the defendants, or the giving of the general release, was procured by the alleged misrepresentations.

The plaintiffs also contend that the general release was voidable because of fraudulent nondisclosure of material facts. The basis of this contention is that the defendants stood in a fiduciary relation to the plaintiffs. By the transaction of July 31, 1918, sixteen thousand five hundred shares in the Felt Company and five hundred shares in the Green Company were sold by the plaintiffs to the defendants. It was an outright sale. The plaintiffs had merely an option to repurchase the property for $1,227,000 on or before July 25, 1920. The defendants were not their trustees. They had to be in readiness to transfer the property to the plaintiffs, on payment of the price; but they stood in no confidential relation to them by reason of this sale and option to repurchase. Even if it be assumed that the defendants concealed from the plaintiffs the existence of an unlawful combination and the actual condition of the business and affairs of the various corporations, as purchasers of the shares under the agreement of July 31, with an option to repurchase, they were not the plaintiffs' agents, and therefore were under no duty of disclosure. *Thacher* v. *Weston*, 197 Mass. 143. *Eastman Marble Co.* v. *Vermont Marble Co.* 236 Mass. 138, 152. *Loring* v. *Lamson & Hubbard Corp.* 249 Mass. 272. *Edwards* v. *West*, 7 Ch. D. 858. See also. *Wehrle* v. *Mercantile National Bank of Salem*, 221 Mass. 585.

The written agreement for the sale of the Felt and Green shares, with the option to repurchase, shows on its face that it was an outright sale. Parol evidence however was introduced, which the plaintiffs say controls the written contract and indicates that the transaction was not a sale, but was a pledge. The contention of the plaintiffs is that the de-

fendants, holding these shares in pledge, were trustees of the plaintiffs and bound by law to make full disclosure of the existence of the conspiracy and of all material facts. Assuming the parol evidence to be admissible, in an action at law, by virtue of the statute that allows a plaintiff to allege any facts which would in equity avoid the defence alleged, G. L. c. 231, § 35, and assuming the evidence tended to show that the sale agreement was in fact a pledge, it does not follow from this that the duty of disclosure was imposed on the defendants. As pledgees they were required to use good faith in dealing with the property pledged or in conducting a sale, but this did not impose on them the additional duties of a fiduciary in matters unrelated to the pledge. A pledge is not a trust and the defendants were not trustees in the true sense of the term. "While a pledge sometimes has been spoken of as in the nature of a trust, *Newton* v. *Fay*, 10 Allen, 505, 507, strictly it has not the legal characteristics of a trust." *Wehrle* v. *Mercantile National Bank of Salem, supra*, page 587. See *Palmer* v. *O'Bannon Corp.* 253 Mass. 8, 14. The transaction, even with the addition of the parol evidence, was not shown to be a pledge. The plaintiffs were not indebted to the defendants. Their debt to the Chase and Girard banks had been paid. They wrote the Chase National Bank requesting it on payment of the loan to cancel the notes and deliver to Kidder, Peabody and Company the collateral, and the plaintiffs by a separate document stated they had sold the shares to Kidder, Peabody and Company. The transaction was recorded on the books of Willett, Sears and Company as a sale. No new notes were given the defendants. The plaintiffs were under no debt or obligation to the defendants. Sears testified that he understood the contract was in the form of a sale with an option to repurchase. It was made under the advice of counsel. Willett admitted the defendants could not insist that the plaintiffs should take up the option, and in a letter written by him in February, 1919, referred to the agreement as a sale and option. Even if the contract were a mortgage, the relation of mortgagor and mortgagee is not of a fiduciary character. *Hunt* v. *Maynard*,

6 Pick. 489. *King* v. *State Mutual Fire Ins. Co.* 7 Cush. 1. Bower, Actionable Non-Disclosure, § 347.

The plaintiffs refer to a conversation with Fessenden in June, 1918, as showing that the negotiation of the $3,000,000 loan was committed to F. S. Moseley and Company, and because of this, F. S. Moseley and Company became their agents, occupying a position of trust and confidence. F. S. Moseley and Company were note brokers. They had sold to their customers a large amount of the commercial paper of the Felt Company. All that was said at the interview in question was perfectly consistent with a desire to protect these customers and save them from loss. In fact, Sears admitted that he understood at this time that Fessenden had placed a considerable amount of the Felt Company paper, and was under an obligation to do what he could to protect his own customers; that he "was quite interested in that view of the proposition." We do not find anything in this conversation to warrant the finding that Fessenden relinquished his right to act independently and for the best interests of his firm and its customers, or that he submitted himself to the plaintiffs and agreed to act solely for their interests. The burden was upon the plaintiffs to show that Fessenden was their agent. This relation could not be established by evidence tending equally to show that Fessenden was acting for his firm and in the interests of his own customers. *Smith* v. *First National Bank in Westfield,* 99 Mass. 605, 612. *Sprow* v. *Boston & Albany Railroad,* 163 Mass. 330, 341. *Glidden* v. *Chamberlin,* 167 Mass. 486, 498. *Hanna* v. *Shaw,* 244 Mass. 57, 60.

The plaintiffs rely upon *Reed* v. *A. E. Little Co.* 256 Mass. 442. That case is not in conflict: the demurrer in that case admitted that while the defendants' agent was fraudulently pretending to act in the interest of the plaintiff, he was really acting for the defendants. In addition to this, in the case at bar, the plaintiffs were not seeking a loan. It was the corporations which required capital for their business, and if an agency existed, it would be an agency for them, and not for the plaintiffs. See *Storey* v. *Bickford,* 237 Mass. 284. If a wrong were done a corporation by conspiracy or other-

wise, the remedy of the stockholders would be, not by an action of the individual stockholder, but by a proceeding in the name of the corporation. *Converse* v. *United Shoe Machinery Co.* 185 Mass. 422. It also appeared that when arrangements were made for the loan of $3,000,000 both Kidder, Peabody and Company and F. S. Moseley and Company were members of the loan syndicate. That the plaintiffs were aware of this fact is shown by a letter from the Chase National Bank to Willett, dated June 28, 1918, as well as by the records of the meeting of the board of directors of the Felt Company, at which Sears was present; and Sears testified that in June, 1918, at a meeting held at the First National Bank, Fessenden told him of the details of the loan; that his firm (F. S. Moseley and Company) and Kidder, Peabody and Company, would participate in the loan. In our opinion it could not rightly have been found that Fessenden or his firm was the plaintiffs' agent in securing the loan for the corporations.

Sears testified that the firm of Willett, Sears and Company was much embarrassed by the Sydeman suit; that the attachment was made in November and the four months would expire March 29, 1919; that rather than let the attachment mature he would file a petition in bankruptcy or make an assignment; that he reached this conclusion soon after the suit was brought. On this evidence it would seem that the direct cause of the sale to the assignees and the further sale to the defendants and the execution of the release was the Sydeman suit, and with this suit the defendants had nothing to do, they were in no way connected with it. The plaintiffs, acting upon independent advice, transferred their title in the properties to their assignees; the defendants insisted on a full release of all claims and demands if the sale were to take place. This settlement was the free act of the plaintiffs and their assignees. Furthermore, it cannot be said that the defendants divested the plaintiffs of their property on March 24, 1919, by any act of theirs, when on March 13, 1919, the plaintiffs, by their voluntary act, without solicitation on the defendants' part, divested themselves of this property and gave all their rights, title and interest to Allen, Stone and

Prescott. The plaintiffs no longer owned the shares of stock when the general release was given. The legal title had been transferred to the assignees, and the creditors of Willett, Sears and Company had equitable rights in the properties by reason of this assignment. *Whitman* v. *McIntyre,* 199 Mass. 436, 442. See also *Davis* v. *Charles River Branch Railroad,* 11 Cush. 506; *First Baptist Society in Andover* v. *Hazen,* 100 Mass. 322. Whatever wrongs the defendants may have been guilty of they did not deprive the plaintiffs of their Felt and Green shares, when the plaintiffs voluntarily, for reasons satisfactory to themselves, before the release was executed, assigned all their interest in these shares to Stone, Allen and Prescott.

One of the averments in the declaration is to the effect that the defendants, in order "to strongly exert an influence over and pressure upon the plaintiffs to transfer" the title to the shares, "concealed from . . . Choate, Allen, Stone and Prescott the conspiracy that had been entered into, and the . . . means" therein employed. The plaintiffs did not prove this. None of these men were witnesses at the trial and there is nothing to show that they did not possess full information of all the decisive facts. Even if it be assumed that there was a duty on the defendants to disclose the facts, we cannot assume that these men, in dealing with the defendants, were ignorant of the material facts.

What has been said applies to all the details of the plaintiffs' case, including the alleged mismanagement of the properties and the acts of Kidder, Peabody and Company in holding, for the benefit of the loan syndicate, the additional shares of the preferred and common stock of the Green Company, already referred to. There is no evidence that there was any breach of duty in voting this stock. *Lawrence* v. *Curtis,* 191 Mass. 240. The additional shares of the Green stock were deposited with Kidder, Peabody and Company as one of the conditions of the loan of $3,000,000. Although Kidder, Peabody and Company and F. S. Moseley and Company participated in this loan, six different banks joined with them in the undertaking, and agreed to advance the money; these shares were deposited solely for the pur-

pose of allowing Kidder, Peabody and Company to vote the stock. Even if the members of this partnership occupied a relation of trust to the plaintiffs, in holding this stock for voting purposes, there was no fraudulent concealment in the performance of the duties connected with it. There was nothing in the holding of this stock which supports the plaintiffs' contention of a fiduciary relation by the defendants whereby they were under a legal or equitable obligation to communicate to the plaintiffs collateral facts unconnected with the particular transaction. In exercising their rights under this agreement they did not, by concealment or otherwise, induce the execution of the release, or violate the conditions of the contract. See *Potts* v. *Chapin,* 133 Mass. 276, 280; *Eaton* v. *Eaton,* 233 Mass. 351, 371; *Windram Manuf. Co.* v. *Boston Blacking Co.* 239 Mass. 123, 126; *Wellington* v. *Rugg,* 243 Mass. 30, 35.

Nothing appears in the acts of Herrick to show that he was a trustee of the plaintiffs. In fact, according to Willett, at a conference between him, his counsel and Herrick, in September, 1918, Herrick repudiated a suggestion that he was a trustee for the plaintiffs, and Willett apparently did not object to this. See *Young* v. *Walker,* 224 Mass. 491.

It is said by the plaintiffs that the general release is inoperative because obtained by duress. In this Commonwealth a contract made through fear or by such acts of coercion or undue influence as the plaintiffs rely on is not void; it is merely voidable. It may be ratified by the one who is wronged. *Fairbanks* v. *Snow,* 145 Mass. 153. To set aside an agreement because of duress, the will of the party subjected to it must be overcome, and the means made use of must be such as to overcome the mind of an ordinary person. *Morse* v. *Woodworth,* 155 Mass. 233. The duress must be connected with and underlie the contract. See *Barbour* v. *Poncelor,* 203 Ala. 386. If the plaintiffs were free either to rely on their legal rights or to accept the settlement, and they voluntarily decided to accept the terms proposed and deliver the release, there was no coercion in its execution. *Forbes* v. *Appleton,* 5 Cush. 115. *Grimes* v. *Briggs,* 110 Mass.

446.  *French* v. *Kemp*, 253 Mass. 75, 79.   *Hartsville Oil Mill*
v. *United States*, 271 U. S. 43.

Reliance is placed on certain acts of Herrick which, it is
contended, tend to make out a case of undue influence.   The
Sydeman suit was brought in November, 1918.   On Janu-
ary 18, 1919, actions were brought against Willett and Sears
by certain note holders.   On January 22, 1919, an action
at law and a suit in equity, referred to as the Fisher suits,
were brought by one Fisher against the plaintiffs, to recover
on notes of a corporation indorsed by Willett, Sears and
Company.   Herrick was interested in these notes.   The
makers of them were certain subsidiary corporations.
Willett, Sears and Company, by a letter addressed to the
committee representing the banks who were to make the
loans, agreed to "use our utmost endeavors to place" in
their hands sufficient stock in these subsidiary corporations,
"to control the action of the stockholders of those corpora-
tions."   Neither Herrick nor the defendants were trustees
of the plaintiffs and did not stand in a fiduciary relation to
them, or to the makers of the notes.   The purchase of the
notes by Herrick was not in violation of any duty he owed
the plaintiffs.   He was the owner; the plaintiffs were his
debtors.   Even if the suits on these notes had any harmful
effect on the plaintiffs, Herrick had a right to do what he did;
and the enforcement of a legal right by legal means is not
evidence of duress.   *Forbes* v. *Appleton, supra.   Grimes* v.
*Briggs, supra.   Chandler* v. *Sanger*, 114 Mass. 364.   *O'Calla-
ghan* v. *Cronan*, 121 Mass. 114.   *Lajoie* v. *Milliken*, 242
Mass. 508.   On the facts disclosed in this case, the motives
of a creditor in bringing an action to collect a debt are im-
material.   *Bragg* v. *Raymond*, 11 Cush. 274.   *Randall* v.
*Hazelton*, 12 Allen, 412, 418.   *Emmons* v. *Scudder*, 115
Mass. 367, 372.   *DeWolfe* v. *Roberts*, 229 Mass. 410, 412.

It also appeared that, before the Fisher suits were brought,
Willett, in a letter to Charles F. Choate, dated January 14,
1919, discussed with him the matter of a settlement with
the plaintiffs' creditors, and gave to Choate and Allen full
power to make such settlement as seemed best to them.
Willett then knew the financial condition of his firm.   These

conditions existed before the actions in which Herrick was interested were brought. The conduct of Herrick did not operate to coerce the plaintiffs, when they knew before the alleged coercion was applied that they were unable to pay their creditors in full. The statement in *Willett* v. *Herrick*, *supra*, at page 478, with reference to a trustee attempting to make personal profit at the expense of a trust fund, was based on the allegations of the declaration. The evidence does not show that Herrick was a trustee.

The so called Roxbury Carpet Company claim is also relied on as evidence of coercion. The Roxbury Carpet Company was purchased in 1917; about $800,000 was due on the purchase price. The plaintiffs contended it was purchased by the Felt Company; the defendants contended that the Felt Company could not legally make such a purchase and that the stock of the Roxbury Carpet Company was in reality purchased by Willett, Sears and Company with the funds of the Felt Company. Much evidence was introduced on this question. In our opinion it is unnecessary to decide who was in fact the purchaser. There was sufficient evidence to show that the defendants might well have believed in good faith that they had a well founded claim against the plaintiffs, and the attempted enforcement of a demand under these circumstances did not amount to duress. *Lajoie* v. *Milliken*, *supra*. *Forbes* v. *Appleton*, *supra*. *Hackley* v. *Headley*, 45 Mich. 569.

The plaintiffs contend that certain properties (subsidiary corporations in which the plaintiffs and the Felt and Green companies were interested) were mismanaged by the defendants. There was evidence that the operation of these companies "depended upon keeping them in a position to borrow from banks." It also appeared that, at a meeting of the bankers, in discussing the terms of the $3,000,000 loan to the Felt and Green companies, it was stated that it was hopeless to try to finance these smaller companies. It was thought best that they be liquidated and Willett, according to his letter of February, 1920, understood this. The evidence shows that the liquidation of these companies was conducted by the bank creditors rather than the de-

fendants.   Joseph O. Procter became the treasurer of some of these corporations, and as such proceeded to liquidate the companies.   Both Willett and Sears were frequently in consultation with Procter during the liquidation.   Sears testified he saw Procter a number of times in connection with the various liquidations and never questioned his good faith.   He also had the assistance of Herrick, Fessenden and Winsor; but they were not the agents of the plaintiffs in this work and occupied toward them no position of trust.   Fessenden and Herrick were paid for their services, and, from the statement of the plaintiffs' counsel to the trial judge, we do not understand that the plaintiffs questioned the reasonableness of the amounts charged for their services.   Even if we are wrong in this conclusion, without going into details we find no evidence of intentional mismanagement on the part of the defendants, and if there were any negligent mismanagement, which we do not intimate, it does not support the plaintiffs' action.   See *Dunton* v. *Derby Desk Co.* 186 Mass. 35, 38. It does not show that in combination the defendants induced or accomplished a consummation of the release, and it is not shown that independently of the conspiracy the conduct of the defendants was fraudulent and resulted in the release. The defendants, as has been said, were not the trustees of the plaintiffs, and the evidence does not warrant a conclusion that their acts were illegal or wrongfully accomplished the final settlement.

We find nothing in the dealings as to the Rich Building to support the plaintiffs' contention.

The plaintiffs' case is not one to recover for fraud or concealments, nor to set aside a written agreement on the ground of fraud.   Their action at law is based on the conspiracy, on the unlawful exercise of combined power and influence.   It was decided in *Willett* v. *Herrick, supra,* that this wrongful combination was the essence of the charge.   The action was not altered in this connection by the subsequent amendment to the declaration in reference to the general release. The declaration as amended sets out the wrongs done by this conspiracy which became effective by reason of the use of power in combination.   According to these averments the

execution of the release was one of the means by which the conspiracy was perfected. The plaintiffs did not seek to recover for an independent tort apart from the conspiracy. The burden was upon them to prove that the misrepresentations and fraud alleged were the means employed by the defendants as a part of the combined action to induce the making and delivering of the general release. Under the allegations of the declaration their case was not made out unless these things were established, and unless it was shown by evidence that the combination by its illegal operation caused the release to be signed and delivered. Even if a combination of the kind alleged did in fact exist, and upon this question we express no opinion, there was no evidence that the defendants made use of this power for the purpose of procuring the release; or, by the use of any of its influence, suggested the release or caused it to be consummated. The mere existence of such a combination was not enough. The exercise of the power directed toward the execution of the release was essential. This could not be left to surmise or conjecture, it must be shown by direct or circumstantial evidence. The settlement between the plaintiffs and defendants was not the result of the illegal power of the defendants acting through a conspiracy. It was not shown that by concealments, misrepresentations or fraud in the exercise of power in combination the release was perfected. If these averments in the declaration are rejected, there is no evidence of fraud or illegal concealment separate and distinct from the alleged conspiracy which entered into the release or operated to accomplish it.

The facts do not show that the plaintiffs were coerced and forced to sign the release. Duress as well as fraud is not to be presumed; it must be proved. Antecedent fraud, duress, concealment or misrepresentation as an instrument of an illegal conspiracy or distinct from and not connected with the conspiracy, may be remitted. The parties had the right to adjust their controversies and release each other of all obligations. To invalidate a release of this kind, fraud or other illegal acts must operate to produce its execution and contribute to it as a cause. See *Dawe* v. *Morris*, 149

Mass. 188.   Such a release is not impaired by misrepresenta-
tions of collateral matters not essential to it.   *Kaplan* v.
*Suher, supra.*   There was no evidence for the jury that any
illegal methods induced the signing of this document.   It
was a complete bar to the plaintiffs' action.

We have not thought it necessary to go further into the
details of the various transactions.   All the evidence has
been thoroughly examined and every argument advanced
on behalf of the plaintiffs has been carefully considered.
The plaintiffs' affairs were much involved; their solution
required ability and judgment.   Willett understood the
financial and operating burden the firm was carrying.   There
was no evidence that the discretion of the defendants was
abused or made use of to bring about the final settlement.
We have not considered the effect of the plaintiffs' failure
to return the consideration received when the release was
signed, and their failure to rescind the release.   Nor have
we thought it necessary to discuss the question of the
plaintiffs' ratification of the release.

It may have been thought, by reason of the original trans-
action of July 31, 1918, that the plaintiffs were the victims
of a hard bargain; being in financial distress, that advantage
was taken of their inability to continue their business; that
a capacious price was asked for the right to repurchase the
shares, and for the loan by the bankers; that the plaintiffs
had to yield or retire.   It may have been believed also that
the undertaking was profitable to the defendants.   On the
other hand, the defendants were taking a risk; they were
investing their own funds.   We are concerned only with the
legal rights of the parties, and cannot deal with the ethics of
the situation.   The defendants were fully exonerated of these
prior acts and the injury, if any, flowing from them.   How-
ever great the plaintiffs' loss may have been, or however
hard the terms, they intelligently signed a document releasing
the defendants from all actions and demands, when they were
free to accept its terms or rely on their rights at law.   Such
a document cannot be set aside unless the plaintiffs' legal
rights were invaded.   It was a valid and legal instrument
and a bar to the plaintiffs' action.   There was no connection

between the various acts relied on by the plaintiffs to establish a conspiracy and the fulfilment of the settlement; no fraud or duress entered into the execution of the release. There would be no faith in the obligation of a contract or confidence in its performance if an instrument such as this general release, signed and delivered under the advice of counsel, without fraud or coercion, could be set aside and rendered worthless. It therefore follows that the defendants' motion for a directed verdict should have been allowed.

*Exceptions sustained.*
*Judgment for the defendants.*